IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JOHN FERNANDEZ,**<br><br>Petitioner,<br><br>v.<br><br>**BIEDER,**<br><br>Respondent. | **Case No. 1:11-cv-01666 AWI MJS (HC)**<br><br>**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent is represented by William K. Kim of the office of the California Attorney General.

## I.   PROCEDURAL BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Tulare, following his conviction by jury trial on November 26, 2008, of first degree murder and various gang and firearm enhancements. (Clerk's Tr. at 472-73.) On February 20, 2009, Petitioner was sentenced to life without the possibility of parole in state prison. (Id.)

Petitioner's direct appeal was denied by the California Court of Appeal, Fifth Appellate District on April 7, 2010. (Lodged Doc. 1.) Petitioner filed a petition for review

1   with the California Supreme Court. The petition was summarily denied on July 14, 2010.

2   (Lodged Doc. 3.)

3       Petitioner filed his federal habeas petition on October 3, 2011. (Pet., ECF No. 1.)

4   Petitioner raises three grounds for relief: 1) that the trial court's jury instruction regarding

5   natural and probable consequences was prejudicial; 2) that the trial court erred in

6   allowing the jury to hear prejudicial lay witness opinion; and 3) that the trial court

7   committed prejudicial error in denying Petitioner's motion to sever the trial from his co-

8   defendant. (Pet. at 7-8.)

9       Respondent filed an answer to the petition on January 13, 2012. (Answer, ECF

10  No. 16.) Petitioner did not file a traverse. The matter stands ready for adjudication.

11  **II.**   **STATEMENT OF THE FACTS**[1]

12          In August 2007, Florez and Fernandez were active members of
    North Side Visa (NSV), which is a subset of the Norteno street gang.
13  Florez and Fernandez were arrested together in June 2007. Florez was
    known by members of the community to habitually carry a gun. A gang
14  expert testified "escalation of force" from a fist fight to an altercation
    involving a knife or gun was "on the rise" among Nortenos in the past few
15  years. Many incidents start out with fist fighting but if one of the parties
    has a weapon, "more times than not … it seems that the weapon is now
16  being used."

17          Oriental Troop (OT) was a subset of the Sureno street gang. NSV
    and OT are rivals. Members of NSV were Hispanic; members of OT were
18  Asian. West Houston Avenue in Visalia was a dividing line between the
    two gangs' territories. A gang expert testified OT "has a general history of
19  not getting along with Nortenos and there have been shootings and
    altercations" including the shooting death of Robert Trevino, who was a
20  Norteno, by Cha Wasee, who was an OT.

21          Around 7:45 p.m. on the evening of August 17, 2007, the victim and
    his cousin were walking toward West Houston Avenue. The victim was
22  Asian. Fernandez's 15-year-old brother and a 13-year-old boy were riding
    together on a single bicycle. They approached the victim. One of the boys
23  announced, "North Side Visa" and challenged the victim by saying, "Do
    you have something to say to us[?]" The victim "said that he doesn't
24  bang," meaning that he is not involved with a gang. The boys said,
    "[T]hat's him," and left. The victim and his cousin continued walking.

25
            Moments later, Fernandez arrived on a bicycle. Without saying a
26

    ---

27  [1]The Fifth District Court of Appeal's summary of the facts in its April 7, 2010 opinion is presumed correct.
    28 U.S.C. § 2254(e)(1).

28

word, he got off the bicycle and attacked the victim with his fists. The victim ducked to avoid the blows and fell to his knees. Fernandez continued to punch him.

Fernandez's brother and the 13-year-old boy returned on a single bicycle; Florez was perched on the bicycle's handlebars.

The victim's cousin testified neither Florez nor the younger boys joined in the beating. The victim struggled away from Fernandez and started to run away. The person on the handlebars, who was wearing a white shirt, jumped off, pulled out a small, black gun and fired at the victim. The victim continued running. The shooter fired several more shots at the victim. Fernandez was standing by the shooter. Neither Fernandez nor either of the younger boys was the shooter.

The victim collapsed onto the sidewalk and died a short time later. A bullet had entered the front of the victim's chest and traveled downward through his heart and left lung.

Fernandez and Florez fled together on one of the bicycles. The two younger boys left together on the other bicycle.

The victim was attacked in front of a house where R.S. and her adult daughter lived. Florez lived two doors away from them. R.S. told a police officer that Florez grabbed the victim into a headlock and started beating him on the head. Then Florez pulled out a gun and fired three shots at the victim. The victim was facing Florez when the first shot was fired.

R.S.'s daughter told a police officer that she saw Florez and Fernandez beat up the victim. She went outside and told Florez "to knock it off." Then she went inside her residence. She heard about five gunshots. She told the officer that she did not see the shooting and "would not" identify the shooter.

N.J. was using a pay phone when she heard a fight and turned toward the scene. Someone said, "North Side Visa." She saw a person hit the victim. Then a different person jumped off the handlebars of a bicycle, pulled out a gun and fired at the victim. The shooter was facing the victim when he fired the first shot. The victim turned and fled. The shooter fired a few more shots at the victim. N.J. testified the shooter was shorter than the person who hit the victim. Booking information reflected that Florez was five feet, three inches tall and Fernandez was five feet, eight inches tall. A police officer testified N.J. told him the shooter was wearing a white shirt and blue jeans. Jones testified the shooter wore a striped shirt but, at one point, acknowledged that if she told a police officer that the shooter was wearing a white shirt, this would be "fine with [her]" because "as of right now everything just seems like a blur because so many things were happening at that time." Five other witnesses testified Florez was wearing a white shirt and three witnesses testified Fernandez was wearing a striped shirt.

L.V., who is the mother of Florez's child, was outside with her mother, her child and her friend, K.J., around the time of the attack. K.J. told a police officer that Fernandez bicycled past them. K.J., L.V. and L.V.'s mother told an officer that Florez and two other boys, all of whom

were on a single bicycle, rode past them; Florez was perched on the handlebars. As Florez passed, K.J. made "fun of him because he wasn't there for the baby." Florez did not pay attention to them. A short while later, they heard several gunshots and went inside the house. K.J. looked out a window and saw the two younger boys pass by on a bicycle. K.J. told a police officer that she also saw Florez and Fernandez pass by on another bicycle. Fernandez was pedaling and Florez was perched on the handlebars. K.J. also told a police officer that "[Florez] and them didn't like the Asians because they were killing everybody or shooting everybody." K.J. testified that at the time the victim was killed she didn't think "anybody" liked Asians, "including myself, because of what happened to Robert Trevino."

About five or 10 minutes after the shooting Isaac Hinojos, who lived across the street from R.S. and her daughter, walked across the street with a cell phone in his hand. He handed the cell phone to R.S.'s daughter. Florez was on the line. Florez said "something to the effect of he knows that they saw what happened, and if they said anything, that the same thing would happen to them." A gang expert testified Hinojos was a NSV member.

Both R.S. and her daughter were scared for their safety and the safety of their families. When R.S. was served with a trial subpoena she told the process server that she would not tell the truth and would deny her previous statements if she was forced to testify. She was afraid that Florez or his friends would conduct a drive-by shooting at her house if she testified truthfully.

Fernandez was arrested four days after the murder. The police had to insert a teargas-type substance into the attic where he was hiding before he would surrender.

Florez was arrested three months later. An officer attempted to stop him for a traffic violation but he sped away and then got out of the car and fled on foot. He was found hiding in another attic.

A gang expert opined the shooting was for the benefit of and in association with NSV because it demonstrated to the community that NSV members would respond forcefully to intrusions into NSV territory by any person who was believed to be a rival gang member.

Neither Florez nor Fernandez called any witnesses.

People v. Fernandez, 2010 Cal. App. Unpub. LEXIS 2520, 3-9 (Cal. App. 5th Dist. Apr. 7, 2010).

## II.    DISCUSSION

### A.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

1    2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

2    suffered violations of his rights as guaranteed by the U.S. Constitution.  In addition, the

3    conviction challenged arises out of the Tulare County Superior Court, which is located

4    within the jurisdiction of this court.  28 U.S.C. § 2241(d); 2254(a). Accordingly, the Court

5    has jurisdiction over the action.

6    **B.    <u>Legal Standard of Review</u>**

7    On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

8    Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

9    filed after its enactment.  <u>Lindh v. Murphy</u>, 521 U.S. 320, 326 (1997); <u>Jeffries v. Wood</u>,

10   114 F.3d 1484, 1499 (9th Cir. 1997). The instant petition was filed after the enactment of

11   the AEDPA; thus, it is governed by its provisions.

12   Under AEDPA, an application for a writ of habeas corpus by a person in custody

13   under a judgment of a state court may be granted only for violations of the Constitution

14   or laws of the United States. 28 U.S.C. § 2254(a); <u>Williams v. Taylor</u>, 529 U.S. at 375 n.

15   7 (2000). Federal habeas corpus relief is available for any claim decided on the merits in

16   state court proceedings if the state court's adjudication of the claim:

17   (1) resulted in a decision that was contrary to, or involved an
18   unreasonable application of, clearly established federal law, as
     determined by the Supreme Court of the United States; or

19   (2) resulted in a decision that was based on an unreasonable
20   determination of the facts in light of the evidence presented in the State
     court proceeding.

21   28 U.S.C. § 2254(d).

22   1.    <u>Contrary to or an Unreasonable Application of Federal Law</u>

23   A state court decision is "contrary to" federal law if it "applies a rule that

24   contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

25   that are materially indistinguishable from" a Supreme Court case, yet reaches a different

26   result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) citing <u>Williams</u>, 529 U.S. at 405-06.

27   "AEDPA does not require state and federal courts to wait for some nearly identical

28   factual pattern before a legal rule must be applied. . . . The statue recognizes . . . that

1    even a general standard may be applied in an unreasonable manner" Panetti v.

2    Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).   The

3    "clearly established Federal law" requirement "does not demand more than a 'principle'

4    or 'general standard.'" Musladin v. Lamarque, 555 F.3d 830, 839 (2009).   For a state

5    decision to be an unreasonable application of clearly established federal law under §

6    2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle

7    (or principles) to the issue before the state court.   Lockyer v. Andrade, 538 U.S. 63, 70-

8    71 (2003).   A state court decision will involve an "unreasonable application of" federal

9    law only if it is "objectively unreasonable."   Id. at 75-76, quoting Williams, 529 U.S. at

10   409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002). In Harrington v. Richter, the

11   Court further stresses that "an *unreasonable* application of federal law is different from

12   an *incorrect* application of federal law."  131 S. Ct. 770, 785 (2011), (citing Williams, 529

13   U.S. at 410) (emphasis in original).   "A state court's determination that a claim lacks

14   merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the

15   correctness of the state court's decision."   Id. at 786 (citing Yarborough v. Alvarado, 541

16   U.S. 653, 664 (2004)). Further, "[t]he more general the rule, the more leeway courts

17   have in reading outcomes in case-by-case determinations."   Id.; Renico v. Lett, 130 S.

18   Ct. 1855, 1864 (2010). "It is not an unreasonable application of clearly established

19   Federal law for a state court to decline to apply a specific legal rule that has not been

20   squarely established by this Court."   Knowles v. Mirzayance, 129 S. Ct. 1411, 1419

21   (2009), quoted by Richter, 131 S. Ct. at 786.

22                    2.      Review of State Decisions

23          "Where there has been one reasoned state judgment rejecting a federal claim,

24   later unexplained orders upholding that judgment or rejecting the claim rest on the same

25   grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the

26   "look through" presumption.   Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

27   (9th Cir. 2006).   Determining whether a state court's decision resulted from an

28   unreasonable legal or factual conclusion, "does not require that there be an opinion from

1    the state court explaining the state court's reasoning." <u>Richter</u>, 131 S. Ct. at 784-85.

2    "Where a state court's decision is unaccompanied by an explanation, the habeas

3    petitioner's burden still must be met by showing there was no reasonable basis for the

4    state court to deny relief." <u>Id.</u> ("This Court now holds and reconfirms that § 2254(d) does

5    not require a state court to give reasons before its decision can be deemed to have been

6    'adjudicated on the merits.'").

7          <u>Richter</u> instructs that whether the state court decision is reasoned and explained,

8    or merely a summary denial, the approach to evaluating unreasonableness under §

9    2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

10   or theories supported or, as here, could have supported, the state court's decision; then

11   it must ask whether it is possible fairminded jurists could disagree that those arguments

12   or theories are inconsistent with the holding in a prior decision of this Court." <u>Id.</u> at 786.

13   Thus, "even a strong case for relief does not mean the state court's contrary conclusion

14   was unreasonable." <u>Id.</u> (citing <u>Lockyer v. Andrade</u>, 538 U.S. at 75). AEDPA "preserves

15   authority to issue the writ in cases where there is no possibility fairminded jurists could

16   disagree that the state court's decision conflicts with this Court's precedents." <u>Id.</u> To put

17   it yet another way:

18          As a condition for obtaining habeas corpus relief from a federal
            court, a state prisoner must show that the state court's ruling on the claim
19          being presented in federal court was so lacking in justification that there
            was an error well understood and comprehended in existing law beyond
20          any possibility for fairminded disagreement.

21   <u>Id.</u> at 786-87. The Court then explains the rationale for this rule, i.e., "that state courts

22   are the principal forum for asserting constitutional challenges to state convictions." <u>Id.</u> at

23   787. It follows from this consideration that § 2254(d) "complements the exhaustion

24   requirement and the doctrine of procedural bar to ensure that state proceedings are the

25   central process, not just a preliminary step for later federal habeas proceedings." <u>Id.</u>

26   (citing <u>Wainwright v. Sykes</u>, 433 U.S. 72, 90 (1977).

27          3.    <u>Prejudicial Impact of Constitutional Error</u>

28          The prejudicial impact of any constitutional error is assessed by asking whether

7

1  the error had "a substantial and injurious effect or influence in determining the jury's

2  verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551

3  U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the

4  state court recognized the error and reviewed it for harmlessness). Some constitutional

5  errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v.

6  Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659

7  (1984). Furthermore, where a habeas petition governed by AEDPA alleges ineffective

8  assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the

9  Strickland prejudice standard is applied and courts do not engage in a separate analysis

10 applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918, n. 7 (2002). Musalin

11 v. Lamarque, 555 F.3d at 834.

12 **III.    REVIEW OF PETITION**

13      **A.    Claim One: Instructional Error Claim**

14      Petitioner claims that his due process rights were violated by the improper jury

15 instruction regarding natural and probable consequences. (See Pet.)

16           1.    State Court Decision

17      Petitioner presented this claim by way of direct appeal to the California Court of

18 Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the

19 appellate court and summarily denied in subsequent petition for review by the California

20 California Supreme Court. (See Lodged Docs. 1-3.) Because the California Supreme

21 Court's opinion is summary in nature, this Court "looks through" that decision and

22 presumes it adopted the reasoning of the California Court of Appeal, the last state court

23 to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.3

24 (1991) (establishing, on habeas review, "look through" presumption that higher court

25 agrees with lower court's reasoning where former affirms latter without discussion); see

26 also LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000) (holding federal courts

27 look to last reasoned state court opinion in determining whether state court's rejection of

28 petitioner's claims was contrary to or an unreasonable application of federal law under

8

28 U.S.C. § 2254(d)(1)).

In denying Petitioner's claim, the California Court of Appeal explained:

**III. Misinstruction on the natural and probable consequences doctrine was harmless beyond a reasonable doubt.**

Relying on <u>Hart</u>, supra, 176 Cal.App.4th 662, Fernandez contends the instruction on the natural probable consequences doctrine was erroneous because it did not direct the jury to determine whether premeditated murder, not just murder, is a natural and probable consequence of gang-related fighting. As will be explained, the alleged instructional error is harmless beyond a reasonable doubt.

**A. Facts**

The jury was instructed on two theories under which Fernandez could be found guilty of murder: as an aider and abettor of the perpetrator or under the natural and probable consequences doctrine. The court used CALCRIM Nos. 400, 401 and 402 to instruct on aiding and abetting and CALCRIM No. 403 to instruct on the natural and probable consequences doctrine. In relevant part, CALCRIM No. 400 provides, "A person is equally guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it." CALCRIM No. 403 informed the jury that it could find Fernandez guilty of murder under the natural and probable consequences doctrine if the People proved all of the following: (1) he was guilty of the crime of gang-related fighting; (2) during the commission of this crime, a coparticipant in the fighting committed the crime of murder; (3) "[u]nder all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the MURDER was a natural and probable consequences of the [gang-related fighting]." CALCRIM No. 403 also instructed, "To decide whether [the] crime of MURDER was committed, please refer to the separate instructions that I will give you on that crime."

The jury was instructed on the general principles applicable to homicide with CALCRIM Nos. 500, 520, 521. In relevant part, CALCRIM No. 521 informed the jury that if it decides a defendant has committed murder, it must then decide whether it is murder of the first or second degree. "A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before committing the act that caused death."

The jury was instructed on the elements of the gang special circumstance with CALCRIM No. 736. CALCRIM No. 702 was given to instruct on the intent to kill requirement contained in the gang special circumstance for defendants who were not the actual killer. In relevant part, CALCRIM No. 702 provided, "In order to prove this special circumstance for a defendant who is not the actual killer but who is guilty of first degree murder as an aider and abettor, the People must prove [beyond a reasonable doubt] that the defendant acted with the intent to

9

kill."

In relevant part, the jury found Fernandez guilty of first degree murder and it found the gang special circumstance to be true.

**B. This instructional claim was not forfeited.**

People v. Samaniego (2009) 172 Cal.App.4th 1148 (Samaniego) concluded that a challenge to CALCRIM No. 400's failure to inform the jury that an aider and abettor can be guilty of a lesser degree than the perpetrator was forfeited because appellant had not sought modification or clarification of the instruction during trial. (Id. at p. 1163.)

Similarly, in this case Fernandez did not seek modification of CALCRIM No. 403 or otherwise challenge the completeness and accuracy of instruction on the natural and probable consequences doctrine. However, we differ with Samaniego on the question of forfeiture. We believe People v. Flood (1998) 18 Cal.4th 470 at page 482, footnote 7, (Flood) and People v. Smithey (1999) 20 Cal.4th 936 at page 976, necessitate the conclusion that this point is cognizable despite the absence of trial objection. A defendant's claim that an instruction misstated the law or violated his right to due process such as by omitting an element of an offense "is not of the type that must be preserved by objection." (People v. Smithey, supra, 20 Cal.4th at p. 976, fn. 7; see also, § 1259.)

**C.  Misinstruction  occurred  on  the  natural  and  probable consequences doctrine.**

In People v. Medina (2009) 46 Cal.4th 913, our Supreme Court recently upheld murder and attempted murder convictions based on application of the natural and probable consequences doctrine where a gang-related fistfight involving the defendants and the victim ended in death when one of the defendants shot and killed the victim as the victim was driving away from the scene of the fight with a friend. The high court explained the natural and probable consequences doctrine as follows:

"[P] 'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable. [Citation.]' [Citation.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.' [Citation.]

"'[A]lthough variations in phrasing are found in decisions addressing the doctrine -- "probable and natural," "natural and reasonable," and "reasonably foreseeable" -- the ultimate factual question is one of foreseeability.' [Citation.] Thus, '"[a] natural and probable consequence is a foreseeable consequence" ....' [Citation.] But 'to be

10

reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough…." [Citation.]' [Citation.] A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citations.]" (People v. Medina, supra, 46 Cal.4th at p. 920.)

Our Supreme Court has not specifically determined whether a defendant can be guilty of a homicide offense of a *lesser* degree than that committed by the perpetrator under the natural probably consequences doctrine. However, a quartet of cases emanating from the Second and Third District Courts of Appeal have concluded that a defendant can be guilty under the natural and probable consequences doctrine of a lesser crime than the perpetrator and that instruction on this principal is required in appropriate factual circumstances.

This developing line of authority begins with People v. Woods (1992) 8 Cal.App.4th 1570 (Woods). There, two defendants assaulted two people and stole some property. During the getaway, one of the defendants shot and killed the occupant of a nearby car. Both defendants were convicted of first degree murder. During deliberations, the jury asked if it could convict the accomplice of second degree murder even if the shooter was guilty of first degree murder. The trial court responded in the negative. A divided panel of the Third District Court of Appeal held that the trial court's response was erroneous because an aider and abettor may be found guilty under the natural and probable consequences doctrine of a lesser crime than that committed by the perpetrator, when the evidence suggests the ultimate crime was not reasonably foreseeable but a lesser crime committed by the perpetrator during the accomplishment of the ultimate crime was foreseeable. (Id. at pp. 1577, 1586-1587.) Under the facts of the case, the jury could have determined it was not reasonably foreseeable that the codefendant would commit premeditated murder of an innocent bystander but that it was foreseeable that he might kill intentionally but without premeditation. (Id. at p. 1590.) The accomplice's premeditation finding was reversed.

Woods's rationale was extended in Hart, supra, 176 Cal.App.4th 662. There, two defendants attempted to rob the victim. During the course of the robbery, one of the defendants shot the victim in the abdomen. Both defendants were convicted of first degree attempted murder under instructions similar to those given in this case. The Third District Court of Appeal concluded that the jury was not properly instructed on the natural and probable consequences doctrine. The instructions failed to inform the jury that to find the accomplice guilty of attempted premeditated murder "it was necessary to find that attempted premeditated murder, not just attempted murder, was a natural and probable consequence of the attempted robbery." (Id. at p. 673.) Hart held "that the trial court has a duty, sua sponte, to instruct the jury in a case such as this one that it must determine whether premeditation and deliberation, as it relates to attempted murder, was a natural and probable consequence of the target crime." (Ibid.) It explained that the instructions "merely failed to inform the jury that it could convict [the accomplice] of a lesser crime than [the shooter] under the natural and probable consequences doctrine." (Id. at p. 674.) It reasoned, "[u]nder the instructions given, the jury may have found

[the accomplice] guilty of attempted murder using the natural and probable consequences doctrine, an objective test, and then found the premeditation and deliberation element true using the only instruction given as to that element, which described a subjective test" and, therefore, the jury charge was "prejudicially deficient." (Ibid.) It also stated that based on the facts of the case, the jury could have found that attempted unpremeditated murder was a natural and probable consequence of the armed robbery but that attempted premeditated murder was not foreseeable. (Id. at p. 672.) The accomplice's premeditation finding was reversed.

In Samaniego, 172 Cal.App.4th 1148, the Second District Court of Appeal held that an aider and abettor's guilt may be less than the perpetrator's.[FN3] (Id. at p. 1164.) "Consequently, CALCRIM No. 400's direction that '[a] person is equally guilty of the crime … whether he or she committed it personally or aided and abetted the perpetrator who committed it' [citation], while generally correct in all but the most exceptional circumstances, is misleading here and should have been modified." (Id. at p. 1165.) It then found the misinstruction to be harmless beyond a reasonable doubt. It explained that the jury necessarily found that each of the defendants acted with the intent to kill because it found a multiple murder special circumstance allegation to be true. Furthermore, "[i]t would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required. [Citation.]" (Id. at p. 1166.)

> **FN3**. Despite concluding the point had been forfeited, the reviewing court addressed the merits of appellant's claim. (Samaniego, supra, 172 Cal.App.4th at pp. 1163-1166.)

Most recently, in People v. Nero (2010) 181 Cal.App.4th 504 (Nero), defendant Bennie Nero stabbed the victim to death with a knife that the prosecution argued defendant Lisa Brown had handed to him. During deliberations, the jury asked if it could find an aider and abettor guilty of a greater or lesser crime than the direct perpetrator. The trial court replied that the principals in a crime are equally guilty. Both of the defendants were convicted of second degree murder. The Second District Court of Appeal determined that the trial court's response was erroneous because an aider and abettor may be found guilty of a lesser homicide related offense than the actual perpetrator. It observed that even in unexceptional circumstances CALCRIM No. 400 can be misleading and suggested that the pattern instructions on aider and abettors should be modified. The appellate court determined it could not find beyond a reasonable doubt that Brown would have been found guilty of second degree murder in the absence of the erroneous response to the jury's question. Therefore, it reversed the judgment as to her and remanded for further proceedings.

We discern no convincing basis to depart from the substantive line of reasoning developed in Woods, Hart, Samaniego and Nero. Respondent argues there is a split in authority, citing the Second District Court of Appeal's 2005 decision in People v. Cummins (2005) 127 Cal.App.4th 667 (Cummins). There, the defendants had kidnapped the victim, taken him to the edge of the cliff, and then one of the defendants

pushed him off. <u>Cummins</u> concluded that even though the evidence did not conclusively determine which defendant had physical contact with the victim when he was pushed, the accomplice's conduct was not any less blameworthy than the actual perpetrator. It found the instructions on murder and aiding and abetting were legally adequate and rejected the claim that a <u>Hart</u>-type instruction should have been given. However, the facts of <u>Cummins</u> would not have supported such an instruction. Moreover, the recent decisions issued by the Second District Court of Appeal in <u>Samaniego</u> and <u>Nero</u> substantively agree with <u>Woods</u> and <u>Hart</u>. To the extent there might have been a split between the Second and Third District Courts of Appeal on the question whether an aider and abettor can be convicted of a lesser crime than the principal, it appears to have been resolved.

Accordingly, we agree with Fernandez that the jury should have been instructed it could find him guilty of first degree murder under the natural and probable consequences doctrine only if it found premeditated murder was objectively foreseeable.

**D. The misinstruction is harmless beyond a reasonable doubt.**

We now turn to an assessment of prejudice. Neither Fernandez nor respondent articulates the standard of prejudice that should be applied to this instructional error.

Two different prejudice standards have been applied in published cases on this topic. <u>Samaniego</u>, supra, 172 Cal.App.4th at page 1165 and <u>Nero</u>, supra, 181 Cal.App.4th at page [p. 11 of Westlaw printed opinion], determined that the instructional errors at issue resulted in the omission or misdescription of an element of the charged offense and therefore the <u>Chapman</u> standard applies (<u>Chapman v. California</u> (1967) 386 U.S. 18, 24 (<u>Chapman</u>)). "Under that test, an appellate court may find the error harmless only if it determines beyond a reasonable doubt that the jury verdict would have been the same absent the error. [Citation.]" (<u>Samaniego</u>, supra, 172 Cal.App.4th at p. 1165.)

<u>Hart</u> applied a slightly different prejudice standard. In relevant part, it asserts, "Error in instructing the jury concerning lesser forms of culpability is reversible unless it can be shown that the jury properly resolved the question under the instructions, as given. (<u>People v. Chatman</u> (2006) 38 Cal.4th 344, 392 ….)" (<u>Hart</u>, supra, 176 Cal.App.4th at pp. 673-674.) It then found the instructional error prejudicial because "the jury may have found [the aider and abettor] guilty of attempted murder using the natural and probable consequences doctrine, an objective test, and then found the premeditation and deliberation element true using the only instruction given as to that element, which described a subjective test." (<u>Hart</u>, supra, 176 Cal.App.4th at p. 674.) <u>Hart</u> relied exclusively on <u>People v. Chatman</u>, supra, 38 Cal.4th at page 392 for its prejudice standard. However, <u>Chatman</u> did not conclude that such an instructional error is reversible unless it can be shown that the jury properly resolved the question under the instructions, as given. <u>Chatman</u> actually states, in relevant part, "'Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions.' [Citation.]" (<u>Chatman</u>, supra, 38 Cal.4th at p. 392, italics added.) Thus, <u>Chatman</u> simply supports the

13

unremarkable proposition that failure to instruct on a lesser included offense is harmless when the jury has necessarily decided the relevant factual question adversely to defendant under other properly given instructions. Nothing in <u>Chatman</u> supports the position that in all other situations an error in failing to instruct on a lesser included offense is prejudicial. Therefore, we do not find <u>Hart </u>convincing on the question of prejudice.

We believe <u>Samaniego</u> and <u>Nero</u> apply the correct prejudice standard.**[FN4]** The instructional error in this case omitted the premeditation element of first degree murder from the natural and probable consequences theory of liability. The general instructions on murder did not supply the missing element because foreseeability is an objective standard under the natural and probable consequences doctrine, but the instruction on premeditation described a subjective standard (CALCRIM No. 521).

> **FN4**. <u>Woods</u> did not explicitly determine what prejudice standard should be applied. Under the unique facts of <u>Woods</u>, prejudice is apparent under any possible standard.

In <u>People v. Flood</u> (1998) 18 Cal.4th 470, our Supreme Court determined that omission of an element is determined for purposes of California law under the <u>Watson</u> standard and for purposes of federal constitutional claims under the <u>Chapman</u> standard. (<u>Id.</u> at pp. 490, 503-504.) The following year, in <u>Neder v. United States</u> (1999) 527 U.S. 1, the United States Supreme Court held that omission of an element is an error that is subject to analysis under the <u>Chapman</u> standard of whether it appears beyond a reasonable doubt that the error did not contribute to the verdict. (<u>Id.</u> at p. 15.) <u>Neder</u> explained that the appellate court is to ask whether the record contains evidence that could naturally lead to a contrary finding with respect to the omitted element. (<u>Id.</u> at p. 19.) Under the <u>Chapman</u> standard when "no rational jury could have found the missing element unproven, the error is harmless beyond a reasonable doubt." (<u>People v. Nicholson</u> (2004) 123 Cal.App.4th 823, 833.) Also, an error is harmless under this standard when the defendant effectively concedes the existence of the missing element by failing to offer any evidence on the element, failing to dispute the prosecution's evidence and failing to argue to the jury that the prosecution failed to prove the element beyond a reasonable doubt. (<u>Flood</u>, supra, 18 Cal.4th at pp. 504-505.)

After examination of all the circumstances, we conclude that it appears beyond a reasonable doubt that the instructional error did not contribute to the verdict. There is nothing in this case indicating that the jury thought Fernandez was less culpable than Florez. The jury never asked such a question or indicated that it was confused on the point. Nothing in this case suggests that the jury wanted to convict Florez of something less than first degree murder but erroneously believed that it could not do so.

Also, the jury did not need the natural and probable consequences theory to find Fernandez liable for first degree murder. The prosecutor focused on Fernandez's guilt as an aider and abettor during his closing arguments. During the prosecutor's brief remarks about the natural and probable consequences doctrine, he did not tell the jury that they were barred from convicting Fernandez of any offense less than it found Florez

guilty of committing. During his closing argument, Fernandez's attorney focused exclusively on the aiding and abetting theory, arguing that Fernandez did not plan to kill the victim with Florez. Further, we know the jury found that Fernandez possessed the intent to kill because of the true finding on the special circumstance. This makes it highly likely that the jury relied on the aiding and abetting theory of liability rather than the natural and probable consequences doctrine.**[FN5]**

> FN5. Fernandez argues the intent to kill was not necessarily contemporaneous with his attack on the victim and that he could have acquired the intent to kill after the victim broke free from him and began to flee. We find that argument entirely unconvincing. In light of the evidence, we do not believe a reasonable jury would conclude that Fernandez arrived with a simple intent to beat up the victim but then subsequently developed the intent to kill. Such a conclusion would require a tortured and strained interpretation of the evidence.

Though circumstantial, the entirety of the evidence overwhelmingly proved Fernandez aided and abetted in the premeditated murder of the victim. Fernandez's brother and another boy mistakenly believed the victim was an OT member and they alerted Fernandez and Florez of the presence of a perceived OT member's presence near the border of NSV and OT territories. Tensions were running high between NSV and OT at that time due to the killing of a NSV member by an OT member. Fernandez immediately sped off to intercept the victim. Without saying a word, Fernandez approached the victim and repeatedly began punching him, preventing the victim from leaving the area. Florez, who is known in the community to usually be armed, arrived with the two younger boys. The victim broke free from Fernandez and began to flee. Florez, in full view of witnesses, shot the victim repeatedly. Fernandez did not stay to assist the victim or indicate any distress or surprise at the shooting. He did not ride away on his bicycle in a panic. Rather, Fernandez and Florez left together on a single bicycle that Fernandez was pedaling.

Furthermore, under the factual circumstances presented in this case, we do not believe a reasonable jury could find that unpremeditated second degree murder was reasonably foreseeable but that first degree premeditated murder was unforeseeable. A gang expert testified that confrontations involving gang members were escalating in recent years and fistfights often ended in shootings or stabbings if any of the participants were armed. It was known in the community that Florez habitually carried a gun. Fernandez was a fellow gang member and had been arrested with Florez on a prior occasion. It would be unreasonable to think that he did not know that Florez regularly carried a gun. There was undisputed testimony from a gang expert about the hostility between NSV and OT members. K.J. testified that she didn't think anyone liked Asians because of what happened to Robert Trevino. Premeditation and deliberation can occur in a brief span of time. (Samaniego, supra, 172 Cal.App.4th at p. 1166.) We do not believe a reasonable jury could have concluded under the facts of this case that a spur of the moment, unpremeditated but intentional murder of an Asian male and presumed OT member was objectively foreseeable, but the premeditated murder of this same person was not foreseeable.

1
2

> Thus, in light of all of the circumstances we conclude it is not reasonably possible that the misinstruction affected the verdict. Therefore, the error is harmless beyond a reasonable doubt. (Samaniego, supra, 172 Cal.App.4th at pp. 1165-1166.)

3  People v. Fernandez, 2010 Cal. App. Unpub. LEXIS 2520 at 16-35.

4              2.    Legal Standard – Instructional Error

5       Jury instruction issues are generally matters of state law for which federal habeas

6  relief is not available. Estelle v. McGuire, 502 U.S. 62, 71-72 (1991). To obtain federal

7  habeas relief, the petitioner must establish not merely that the instruction was

8  undesirable, erroneous, or even universally condemned, but that it violated some federal

9  constitutional right. See Cupp v. Naughten, 414 U.S. 141, 146 (1973). Thus, the central

10  inquiry is whether the instruction in question so infected the entire trial that the resulting

11  conviction violates due process. Id. at 147. In making this inquiry, the court may not

12  assess the instruction in artificial isolation, but must view it in the context of the

13  instructions as a whole and the trial record. McGuire, 502 U.S. at 72. Finally, a habeas

14  petitioner must show that any instructional error "had [a] substantial and injurious effect

15  or influence in determining the jury's verdict." Brecht, 507 U.S. at 637; see Hedgpeth v.

16  Pulido, 555 U.S. 57, 61-62 (2008) (Brecht harmless-error analysis applies to

17  instructional-error claim in habeas case).

18       A petitioner's burden in advancing a claim that a court erred in omitting an

19  instruction is especially heavy. An omission is less likely to be prejudicial than an

20  affirmative misstatement of the law. Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

21  Failure to give a jury instruction which might be proper as a matter of state law does not,

22  by itself, merit federal habeas relief. Miller v. Stagner, 757 F.2d 988, 993 (9th Cir. 1985).

23  "The necessity, extent and character of additional instructions are matters within the

24  sound discretion of the trial court." Wilson v. United States, 422 F.2d 1303, 1304 (9th

25  Cir. 1970).

26              3.    Argument and Analysis

27       The state court conceded that misinstruction occurred with the reading of

28  CALCRIM No. 403 with regard to the natural and probable consequences doctrine.

1   Specifically, the state court found that the jury should have found Petitioner guilty of first

2   degree murder under the natural and probable consequences doctrine only if it found

3   premeditated murder was objectively foreseeable.

4       But the court also explained that it was harmless in light of several facts,

5   including: (1) there was no evidence that the jury thought Petitioner was any less

6   culpable than Florez or wanted to convict Petitioner of anything less than first degree

7   murder, (2) that the jury likely relied on the aiding and abetting theory of liability rather

8   that the natural and probable consequences doctrine, and (3) the fact that Petitioner was

9   aware that Florez was armed and was not surprised when Florez shot the victim, though

10  circumstantial, proved both that Petitioner aided and abetted in the premeditated murder

11  and that a reasonable jury could find that premeditated first degree murder was a

12  reasonably foreseeable consequence of the assault. For the reasons discussed at length

13  by the California Court of Appeal, any possible error did not "ha[ve] [a] substantial and

14  injurious effect or influence in determining the jury's verdict," and thus habeas relief is

15  unavailable. See Brecht, 507 U.S. at 637.

16      This Court agrees with the state court's holding that any possible error in omitting

17  such a clarifying instruction regarding premeditation was harmless, under Brecht, and

18  even under the more defendant-friendly Chapman standard, in light of the evidence and

19  the other instructions given. The jury reasonably could have believed, based on the gang

20  expert's testimony about what a gang member in Petitioner's position would have known

21  and intended, that a fatal and quite intentional shooting by Florez, whom Petitioner knew

22  had a gun, was a natural and probable consequence of Petitioner's own provocative

23  acts. Habeas relief is unavailable.

24      **B.    Claim Two: Evidentiary Error**

25      Petitioner second claim is that permitting the jury to hear a prosecution witness's

26  lay opinion violated his due process rights. (Pet. at 7.)

27          1.    State Decision

28      In the last reasoned decision denying Petitioner's claim, the appellate court

explained:

**II. The evidentiary claim was forfeited.**

At trial, the prosecutor asked N.J., "Did it appear to you that these two suspects were working together in their attack on the victim?" Florez's counsel objected on the ground that it called for speculation. The objection was sustained. The prosecutor asked, "Were these two suspects attacking the victim together?" N.J. replied, "No. I just saw the one on the handle bars." The prosecutor refreshed her recollection with a portion of the preliminary hearing transcript. Then he asked, "Do you remember saying they were working together on it?" She replied, "Yes." Florez's counsel objected, saying "I just objected. It was sustained." Fernandez's counsel joined in the objection. It was sustained. Then the prosecutor asked, "Do you remember indicating at the preliminary hearing that the two subjects were attacking the victim together?" N.J. replied, "When you say 'together,' I'm thinking as in they both knew what was going on and they both kind of knew what they were going to do before they got there. [P] One still stayed on the bike and the other still actually did the physical hitting attacking." The prosecutor asked, "And you're indicating that the one on the bike, he came off the handle bars and shot the victim[?]" N.J. replied, "Yes."

Fernandez argues the trial court committed prejudicial error by not striking the following sentence from N.J.'s testimony on the ground that it was improper lay opinion: "When you say 'together,' I'm thinking as in they both knew what was going on and they both kind of knew what they were going to do before they got there." As will be explained, this contention was not preserved for appellate review.

"Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was 'timely made and so stated as to make clear the specific ground of the objection.'" (<u>People v. Demetrulias</u> (2006) 39 Cal.4th 1, 20 (<u>Demetrulias</u>).) Our Supreme Court has "'"consistently held that the 'defendant's failure to make a timely and specific objection' on the ground asserted on appeal makes that ground not cognizable."' [Citation.]" (<u>Ibid.</u>) If a timely and specific objection or motion to strike was not interposed at trial, the point is not cognizable on appeal; it has been forfeited. (<u>Id.</u> at p. 21.) "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal."' [Citation.]" (<u>People v. Partida</u> (2005) 37 Cal.4th 428, 434 (<u>Partida</u>).) The objection requirement prevents error by allowing the trial judge to consider excluding the evidence or limiting its admission to avoid prejudice. (<u>Ibid.</u>) Also, "'[i]t … allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' [Citation.]" (<u>Ibid.</u>)

In this case, neither Fernandez nor Florez objected to the question that resulted in the contested testimony on any ground or motioned for the contested testimony to be stricken. If Fernandez thought that this portion of N.T.'s testimony constituted an improper lay opinion, it was incumbent on him either to interpose a timely objection to the specific question giving

1
2
3
4
5

rise to this testimony or motion to strike the objectionable testimony. Fernandez cannot remain mute at trial and then claim on appeal that the testimony should have been stricken. A timely objection to the prosecutor's query or a request to strike the contested testimony would not have been futile because the court sustained Florez's objection to an earlier question on this same topic. Therefore, we conclude Fernandez forfeited appellate consideration of this point. (Demetrulias, supra, 39 Cal.4th at pp. 20-21; Partida, supra, 37 Cal.4th at pp. 433-434; People v. Ray (1967) 252 Cal.App.2d 932, 954.)**[FN2]**

6
7
8
9
10

> **FN2.** In any event, the alleged evidentiary error was harmless. Although Fernandez argued that the error was prejudicial, at another point in his opening brief he acknowledged that the challenged testimony was obviously speculative and the jury might have disregarded it. In light of the whole record, we do not find it reasonably probable that this single sentence of testimony affected the verdict. The alleged evidentiary error did not cause a miscarriage of justice. (People v. Watson (1956) 46 Cal.2d 818, 836 (Watson); People v. Alvarez (1996) 14 Cal.4th 155, 216.)

11

People v. Fernandez, 2010 Cal. App. Unpub. LEXIS 2520 at 12-16.

2. Analysis

12
13
14
15
16

To the extent that Petitioner contends that lay witness opinion should have been excluded pursuant to California state evidentiary law, his claim fails because habeas corpus will not lie to correct errors in the interpretation or application of state law. Estelle v. McGuire, 502 U.S. 62, 67 (1991).

17
18
19
20
21
22
23
24
25
26
27

With respect to Petitioner's due process claim, the United States Supreme Court has held that habeas corpus relief should be granted where constitutional errors have rendered a trial fundamentally unfair. Williams v. Taylor, 529 U.S. 362, 375 (2000). No Supreme Court precedent has made clear, however, that admission of irrelevant or overly prejudicial evidence can constitute a due process violation warranting habeas corpus relief. See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." (citation omitted)).

28

Even assuming that improper admission of evidence under some circumstances

1    rises to the level of a due process violation warranting habeas corpus relief under

2    AEDPA, this is not such a case. Petitioner's claim would fail even under Ninth Circuit

3    precedent, pursuant to which an evidentiary ruling renders a trial so fundamentally unfair

4    as to violate due process only if "there are *no* permissible inferences the jury may draw

5    from the evidence." Windham v. Merkle, 163 F.3d 1092, 1102 (9th Cir 1998) (emphasis

6    in original) (quoting Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991)). See

7    also Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005) ("A habeas petitioner bears a

8    heavy burden in showing a due process violation based on an evidentiary decision.").

9    There are permissible inferences the jury could have drawn from the lay witness opinion

10   testimony admitted at trial, specifically that Petitioner and his co-defendant knew each

11   other and may have been aware of each other's motives. Petitioner's trial was not

12   rendered fundamentally unfair in violation of due process based on admission of the lay

13   witness testimony.

14          In any event, the admission of the challenged evidence did not deny Petitioner a

15   fair trial. After a review of the record, this Court finds that the trial court's admission of

16   the lay witness opinion testimony would not have had a "substantial and injurious effect"

17   on the verdict. Brecht, 507 U.S. at 623. See also Penry v. Johnson, 532 U.S. 782, 793-

18   96 (2001). First, the jurors were provided instruction regarding the credibility and

19   believability of witnesses, and would have evaluated the witness's testimony and opinion

20   based on her limited knowledge of defendant and the incident. Further, if the witness

21   was required to rephrase the testimony, she could have stated it in a manner that was

22   not opinion testimony by stating that the attack was coordinated and that the actions of

23   Petitioner and Florez were made in concert. In light of the trial testimony as a whole,

24   there is no reasonable probability the verdict would have been different if the witness's

25   opinion testimony had been excluded.

26          Petitioner is not entitled to federal habeas corpus relief on claim two.

27   **C.       Claim Three: Severance**

28          Petitioner, in his third claim, alleges that the denial of his motion to sever his trial

from co-defendant Florez violated his constitutional right to due process. (Pet. at 8.)

1. State Decision

In the last reasoned decision denying Petitioner's claim, the appellate court explained:

**I. The severance motion was properly denied and joint trial was not unfair.**

The court consolidated Florez's and Fernandez's cases. Fernandez filed a written motion to sever his trial from Florez's trial, which the People opposed. Hearing was conducted. Florez and the People submitted the matter on the moving papers. The court stated it read the moving papers and opposition. The only issue that caused the court "some concern" was Florez's "refusal to waive time" and the consequent possibility that Fernandez could be forced to go to trial before he was ready. Yet, "it appears to the court that if … Fernandez is not prepared on the trial date …, I can continue the trial of Mr. Fernandez and that in and of itself would be good cause to continue the trial of … Florez." The severance motion was denied.

Fernandez contends denial of the severance motion was an abuse of discretion. Also, he argues evidence was introduced at the trial against Florez that unfairly prejudiced the jurors against him and rendered the joint trial grossly unfair, thereby depriving him of due process of law. We are not convinced.

"Section 1098 expresses a legislative preference for joint trials." (People v. Coffman and Marlow (2004) 34 Cal.4th 1, 40 (Coffman).) Joint trials serve the interests of justice by promoting economy and efficiency, as well as ""avoiding the scandal and inequity of inconsistent verdicts."' [Citation.]" (Ibid.) Denial of a severance motion is reviewed for abuse of discretion on the basis of the record at the time of the ruling. (People v. Hardy (1992) 2 Cal.4th 86, 167.) If an abuse of discretion is shown, "reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial. [Citation.]" (Coffman, supra, 34 Cal.4th at p. 41.) "[E]ven if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law. [Citations.]" (People v. Rogers (2006) 39 Cal.4th 826, 851.)

We discern neither an abuse of discretion nor gross unfairness. When defendants are charged with having committed common crimes involving common events and victims, the court is presented with a classic case for a joint trial. (Coffman, supra, 34 Cal.4th at p. 40; People v. Pinholster (1992) 1 Cal.4th 865, 932.) Fernandez and Florez were both members of the same criminal gang. They were charged with the same substantive crime and the same street gang special circumstance which involved the same victim and arose from the same factual circumstances. We reject Fernandez's self-serving claim that the evidence against him was weak. This is not a situation where a weak case against one

1
2
3
4
5
6

defendant was improperly bolstered by joint trial with another, clearly more culpable defendant. The vast majority of evidence about Florez's conduct would have been admissible against Fernandez in a separate trial. Also, the court gave a limiting instruction concerning Florez's post-shooting threat. Limiting instructions often will suffice to cure any risk of prejudice resulting from admission of evidence at a joint trial that applies to only one of the defendants. (Coffman, supra, 34 Cal.4th at p. 40.) There was no significant risk of guilt by association in this case. Accordingly, we conclude denial of the severance motion was not an abuse of discretion. Furthermore, the joint trial was not grossly unfair and did not deprive Fernandez of due process of law.

7

People v. Fernandez, 2010 Cal. App. Unpub. LEXIS 2520 at 9-12.

8

2.    Analysis

9
10
11
12
13
14
15
16
17
18
19
20
21
22

The United States Supreme Court has not determined that a criminal defendant has a federal constitutional right to bifurcation. See Spencer v. Texas, 385 U.S. 554, 565-66 (1967) ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure."); Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983) (reaffirming Spencer). Therefore, a court may grant habeas relief based on a state court's decision to deny a motion for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial. Zafiro v. United States, 506 U.S. 534, 538-39 (1993) (court must decide if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"); Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991) ("The simultaneous trial of more than one offense must actually render petitioner's state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate.") (internal quotation marks and citation omitted).

23
24
25
26
27
28

Petitioner bears the burden of proving that he is entitled to federal habeas relief, Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2003), and must establish that prejudice arising from the failure to grant a severance was so "clear, manifest, and undue" that he was denied a fair trial. Lambright v. Stewart, 191 F.3d 1181, 1185 (9th Cir. 1999) (quoting United States v. Throckmorton, 87 F.3d 1069, 1071-72 (9th Cir. 1996)). "In evaluating prejudice, the [federal habeas court] focuses particularly on cross-

1  admissibility of evidence and the danger of 'spillover' from one charge to another,

2  especially where one charge or set of charges is weaker than another." Davis, 384 F.3d

3  at 638. Undue prejudice also exists "whenever joinder of counts allows evidence of other

4  crimes to be introduced in a trial where the evidence would otherwise be inadmissible."

5  Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

6        On habeas review, federal courts neither depend on the state law governing

7  severance, Grisby, 130 F.3d at 370 (citing Hollins v. Dep't of Corrections, State of Iowa,

8  969 F.2d 606, 608 (8th Cir. 1992)), nor consider procedural rights to a severance given

9  to criminal defendants in the federal criminal justice system. Id. Rather, the relevant

10  question is whether the state proceedings satisfied due process. Id.; see also Cooper v.

11  McGrath, 314 F. Supp. 2d 967, 983 (N.D. Cal. 2004).[1]

12        As the California Court of Appeal correctly observed, this case involved

13  defendants that committed common crimes involving common events and victims.

14  Accordingly, the evidence produced at trial was admissible with regard to both Petitioner

15  and Florez. This fact reduced the possibility of prejudice to Petitioner. Under the

16  circumstances of this case, Petitioner has not established that the state trial court's

17  refusal to bifurcate the trial rendered his trial fundamentally unfair. Davis, 384 F.3d at

18  638. Thus, federal habeas relief is not warranted on this claim.

19  **IV.   RECOMMENDATION**

20        Accordingly, it is hereby recommended that the petition for a writ of habeas

21  corpus be DENIED with prejudice.

22        This Findings and Recommendation is submitted to the assigned District Judge,

23  pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within thirty (30) days after

24  being served with the Findings and Recommendation, any party may file written

25  objections with the Court and serve a copy on all parties. Such a document should be

26

27        [1] To the extent petitioner is arguing that the trial court abused its discretion under state law in denying his request for bifurcation, his claim is not cognizable in these federal habeas proceedings.

28  Estelle, 502 U.S. at 67-68.

captioned "Objections to Magistrate Judge's Findings and Recommendation." Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   October 9, 2013                    /s/ *Michael J. Seng*

                                         UNITED STATES MAGISTRATE JUDGE